## Case No. 8,801.

McGINNIS v. The PONTIAC.

[5 McLean, 359;[1] Newb. 130; 10 West. Law J. 174.]

District Court. D. Ohio. Oct. Term. 1852.

ADMIRALTY JURISDICTION—OHIO RIVER—SALVAGE —TEMPORARY MASTER — PERIL—ESCAPE— CAUSE OF ESCAPE—COMPENSATION.

1. This court has admiralty jurisdiction over the Ohio river.
[Cited in Seven Coal Barges. Case No. 12,677.]

2. Where a steamboat is in actual peril. and one is requested to take charge of her as master, and save her if possible, with no stipulation as to time or wages. the fact of acting as master. not having been so before, will not deprive him of the right to claim salvage.
[Cited in Spencer v. The Charles Avery. Case No. 13,232; The Connemara, 108 U. S. 358. 2 Sup. Ct. 757.]

3. The fact of peril is to be ascertained from the circumstances surrounding the boat at the time when the salvage service commences, and the fact of escape is not to be taken as proof that there was no peril.

4. The fact that the exertions of the salvor did not save the boat, she being saved by the particular manner in which the ice broke up. does not deprive him of the merit of a salvor, if he encountered the danger. and did all that could be done under the circumstances.

5. There is no fixed rule of compensation. It must depend upon the particular circumstances. It may be a per centage upon the property saved, or a fixed sum to be assessed pro rata upon the boat and cargo. In this case the latter course is adopted.

In admiralty.

T. Walker. for libellant.
C. D. Coffin and A. Taft, for defendants.

LEAVITT, District Judge. This is a libel in personam for salvage, prosecuted by Michael N. McGinnis, against the owners and freighters of the steamboat Pontiac No. 2. The material facts stated in the libel, on which the claim of salvage is founded are, that on the 30th of January. 1852, the steamboat Pontiac. with a valuable cargo, bound for Cincinnati, in ascending the Ohio river, some distance below Louisville, met with a gorge of ice, and was in a condition of extreme peril; that having been deserted by all her passengers. and many of her officers and

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

crew, the libellant, then a passenger on the steamboat Sparhawk, also attempting to ascend the river, and involved in the same gorge, was requested by A. Warden, the master, and William F. Belser, one of the owners of the Pontiac, to take charge of her, and try to save her, the said master and owner, then being about to leave her; and that the libellant did accordingly take charge of her, and with the assistance of some of the officers and crew, saved her from her imminent peril, and brought the boat and cargo safely to Cincinnati. The libellant also avers, that upon the arrival of the boat at Cincinnati, he consented to the delivery of the freight to its several owners and consignees, but retained possession of the boat as salvor, till the 10th of February, 1852, when he was forcibly expelled from her by one of the owners, who refused to make him any compensation for his services, except his wages as master, for the time he was in command. The libellant claims reasonable salvage for assistance rendered the boat. The answer of the owners of the boat and of the cargo, after setting out the circumstances connected with the stoppage of the boat in the gorge of ice, denies that she was in peril; and avers that the libellant was employed to take charge of the boat as master, in the place of Captain Warden, then disabled by sickness, and not as salvor. The answer also denies that the Pontiac was deserted or abandoned at the time the libellant took charge of her, and alleges that she was well provided with men and the means necessary to preserve and protect her; and, that she sustained no damage, and proceeded on her way to Cincinnati, in charge of the libellant, as master, because of the continued ill health of Captain Warden, and his inability to resume the command; and, that the services of the libellant do not entitle him to compensation as salvor.

It is also set up in the answer, that the case made in the libel is not within the admiralty jurisdiction of this court. The facts requiring notice, preliminary to the consideration of the points arising in the case, as established by the evidence, may be summarily stated as follows: In the afternoon of the 30th of January last, the steamboats Ohio, G. W. Sparhawk, Washington, Pontiac No. 2, Milton, and Col. Dickinson, in the order here named, were attempting to ascend the Ohio river, through a narrow opening or channel made through the ice by two boats ahead of them, when the whole body of the gorged ice on both sides of this channel, before stationary, began to move, and in its progress entirely shut up the passage through which the boats before named were ascending; and they became so involved in the ice as to render it impossible to move by the aid of their machinery either upward or downward. The mass of gorged ice, thus set in motion, moved a distance of two or three hundred yards, when it stopped. By this moving of the ice, the Ohio, being ahead of

all the other boats, was forced down for some distance; the Sparhawk, being the next to the Ohio, was driven down against the Washington; and such was the force of the collision, that the latter boat was sunk. The Milton was forced against the Col. Dickinson, materially injuring the latter; and, at the same time, the Pontiac was swung round, and driven stern foremost into a crack or opening in the ice, toward the Indiana shore, where she lay when the ice stopped; her bow quartering a little up the stream, and her stern within twenty or thirty yards of the shore. During this movement of the ice, and from the great danger in which all the boats were involved, there was much alarm and consternation among the passengers and crews, which was increased by the cry that the wrecked boat—the Washington—was on fire. The passengers and some of the officers and crews of all the boats, except the Ohio, from which escape was impossible, from the thinness of the ice surrounding her, left the boats in the ice and sought safety on shore. The gorged ice extended for some distance above and below where the boats lay; and, although the natural thickness of the ice, except near the shores, did not exceed six or eight inches, yet as the result of the stoppage of the mass of descending ice, it was so piled up and crowded together, that in some parts of the gorge, it was, as estimated by the witnesses, ten feet, or even twenty feet thick. After the stoppage of the gorge, leaving the Pontiac in the position before described, by the direction of Captain Warden, she was, as far as practicable, made secure in her place by a line or hawser, passed several times from her stern to the shore; and, by his order also, the ice immediately below the boat was cut away, that she might swing in toward the shore when the gorged mass should again start. The libellant, who had for some years been engaged in steamboat service on the river, both as a pilot and master, was a passenger on the Sparhawk. Some time in the afternoon, subsequently to the stoppage of the gorge, as before noticed, by the request of Captain Warden, and the concurrence of William F. Belser, one of the owners of the Pontiac, and then a passenger on her, the libellant consented to take charge of her as master, without any agreement as to compensation, or the time he was to continue in command. Captain Warden and Mr. Belser then left the Pontiac, and did not come on board again that night. Between six and seven o'clock in the evening, the libellant took the command of the boat, and was on duty till morning, giving throughout the night the necessary orders, and attending to the usual duties of a master. About eleven o'clock in the night, from the cracking of the ice above, it became certain it would again shortly be in motion; and, between three and four in the morning, the gorged mass started and passed down without any injury to the Pontiac. In the morning, after relieving her wheel from

the ice which was gorged under and upon it, the boat proceeded on her course upward, in command of the libellant, and arrived at Cincinnati on the 5th of February.

This general view of the evidence will suffice, as opening the way for the consideration of the points arising in the case. It is insisted, in the first place, by the counsel for the respondents, that the libellant, as master of the Pontiac, has no claim for salvage service; having performed no duty that he was not bound to perform in virtue of his official relation to the boat. There is no room to doubt the correctness of the position, as a principle of maritime law, that a master, for any ordinary service in saving his vessel or cargo, cannot assert a claim for salvage. It is well settled, that, "in general, neither the master, nor a passenger, seaman, or pilot, is entitled to compensation in the way of salvage, for the ordinary assistance he may have afforded a vessel in distress, as it is no more than a duty; for, a salvor is a person who, without any particular relation to a ship in distress, proffers useful service, and renders it, without any pre-existing contract, making the service a duty. But a passenger or an officer, acting as such, for extraordinary exertions beyond the line of his duty, has been deemed entitled to liberal compensation as salvage." 3 Kent, Comm. 246; 1 Conk. Adm. 274. In the case before the court, the evidence affords no ground for the conclusion, that the services of the libellant were of such an extraordinary character as to entitle him to salvage, if he is to be viewed merely as the master of the boat, under the usual circumstances of employment as such. But it seems to the court a pertinent inquiry, whether under the peculiar circumstances in which the libellant took charge of the Pontiac, he is within the scope and reason of the rule excluding a master, for ordinary services, from setting up a claim for salvage. The rule is founded on considerations of public policy, and is designed for the protection of the great interests of navigation and commerce. The obvious propriety, not to say necessity, of providing against temptations to place property afloat on the ocean, lakes, or rivers, in a situation of peril, for the fraudulent purpose of asserting a claim of salvage for its protection and safety, led to its adoption. It is a rule, therefore, founded in good sense; and, in all proper cases, should be rigidly observed. But I do not perceive its applicability to the case of this libellant. He was a passenger on another boat, and could have had no agency in bringing the Pontiac into the position of danger in which it is averred she was placed. He was under no obligation to take command of her, or in any way to incur any hazard or render any aid for her protection or safety. He was requested to take charge of the boat, with an injunction to save her if possible, and without any stipulation as to wages or compensation. Do not these circumstances take the case out of the operation of the rule referred to, excluding a master, in ordinary cases, from asserting a claim for salvage service? And may not the libellant be fairly regarded as one who, within the definition before cited, has virtually proffered and rendered useful service to a boat in distress, without any pre-existing contract making the service a duty? So far as motive is concerned, the facts do not allow the presumption that the libellant would voluntarily incur the responsibilities and hazard resulting from his taking command of the boat, for the trifling pecuniary remuneration he would be entitled to as master, at the ordinary rate of wages, for the few days that he would be employed as such. It is therefore consistent with the facts to suppose, that he looked for some compensation for his services beyond the usual pay of a master. In stating, as the result of my examination, that under the circumstances of this case, I do not regard the fact that the libellant was in the position of master at the time the service was rendered, as excluding him from a claim for salvage, it is proper I should say, that I have reached this conclusion, without the aid of any authorities bearing on the point. In looking into the few books on maritime law, which are accessible to me, I have found no case reported, or principle settled, which directly touches the inquiry here involved.

The next point made by the counsel for the respondent is, that the steamboat Pontiac, at the time libellant took charge of her as master, and while he was in command, was not in such a condition of imminent peril as to be a subject of salvage service. It is a well settled principle of maritime law, that "to warrant a claim of salvage, the danger to the property saved must be real and imminent. Mere speculative danger is insufficient; but it need not be such that escape from it by other means was impossible." Talbot v. Seaman, 1 Cranch [5 U. S.] 1; 1 Pet. Cond. R. 229.

In looking into the evidence, it is impossible to resist the conclusion, that the Pontiac was in great danger, at the time, and after the libellant took charge of her. Her position after the moving of the ice in the afternoon, has been before noticed. She lay with her stern toward shore, in a crack or opening in the ice; her bow out, with a slight angle up stream; her stern being made fast to a rock on shore by lines. Several witnesses—of long experience on the river, and familiar with all its perils—say, they considered it certain the whole mass of ice in the river would be in motion during the night. They also state that there was the strongest probability, amounting, in the opinion of some of them to a certainty, that when the ice did start, all the boats in the gorge would be lost. Some of the witnesses state, that the Pontiac, from her position and her heavy freight, was in the greatest danger.

There was danger—some of the witnesses thought it inevitable—that the heavy shore ice would press down against the upper side of the boat and crush her; or, otherwise, the lines with which she was made fast would be broken, and she would be carried down and wrecked upon Rock Island, a short distance below. It appears, too, from the conduct of the passengers on all the boats, that they thought there was the most imminent danger the boats would be lost during the night. All left the boats and went ashore, although the night was very dark with constant rain; preferring to encounter the discomfort of exposure to the inclemencies of the weather—some without any shelter, and some imperfectly protected by tents—to remaining on the boats. As many of the officers and crews of the boats as were not needed for their management, also went on shore. Mr. Belser, one of the owners of the Pontiac, left her as already stated, with a charge to the libellant, in taking command, to save the boat if possible. Captain Warden also, on account of his feeble health, went ashore; giving, as the reason, that remaining on board, in case of accident to the boat, he might be obliged to take to the water, which would, as he thought, endanger his life, in his then condition of bodily ailment. Several witnesses—some of them officers on the Pontiac—state, that no pecuniary consideration would have induced them to stay on board during the night. The event so confidently anticipated in the evening, actually happened during the night. The whole mass of the gorged ice moved about three o'clock, threatening all the boats with destruction. But one, however, the Dickinson, was seriously injured. That the Pontiac was not lost was owing to the fact that the gorge broke first toward the middle of the river, and did not carry with it all the heavy shore ice above her.

This summary of the facts in this case shows, I think, conclusively, that the danger to which the Pontiac was exposed during the night referred to, was not merely speculative, but real and imminent. It is true, it is not proved that but for the service and assistance of the libellant the boat would not have been saved. Yet there can be no doubt that his taking the command of her, under the circumstances, involved great personal peril to himself; and that without his services, the boat and cargo would have been in much greater danger of being lost. Captain Warden, very justifiably, under the pressure of sickness, left her, as did also Mr. Belser, one of the owners. The presence of a master, for the proper management and security of the boat and cargo during the night, was indispensable. And the libellant, in consenting to take charge of her, in her condition of peril, and doing all that could be done for her safety, it seems to me. is not only entitled to the credit of courageous and meritorious conduct, but to a compensation, as

for a salvage service. In 2 U. S. Sup. Dig. 731, I find the doctrine asserted, that, "in all cases where services are rendered in saving property in danger of being lost on the high seas, or when wrecked or stranded on the shore, it is, in the sense of the maritime law, a salvage service." The case referred to in the digest is that of The Centurion [Case No. 2,554]. I have not been able to refer to the reports from which the above citation from the digest purports to have been taken. If the principle is truly stated in the digest, it is certainly broad enough to embrace the present as a proper salvage claim. In reference to the amount of the compensation in salvage cases, there is no fixed rule. It is always to be determined by the sound discretion of the court. In the case of The Adventure, 8 Cranch [12 U. S.] 221, 3 Pet. Cond. R. 93, Mr. Justice Johnson, in delivering the opinion of the court, says: "It (the amount to be allowed) must in every case depend upon peculiar circumstances, such as peril incurred, labor sustained, value decreed, etc., all of which must be estimated and weighed by the court that awards the salvage." Again: "As far as our inquiries have extended, when a proportion of the thing saved has been awarded, a half has been the maximum, and an eighth the minimum; below that it is usual to adjudge a compensation in numero." "The reward should be such as not only to afford an ample remuneration to the salvor for the risk of life and property, and for the labor, privations, and hardships encountered, but so liberal as to furnish a sufficient incentive to similar exertions by others." 1 Conk. Adm. 282; The Henry Ewbank [Case No. 6,376]. "If the property saved is of great value, or if it was in a condition apparently hopeless, but for the interposition of the salvors, or if the service was undertaken with alacrity, and executed with a high degree of skill and energy; or if it involved extraordinary peril. or required severe and exhausting labor, the retribution ought to be proportionally liberal. The opposite of either of these circumstances ought, consequently. to produce the opposite effect." 1 Conk. Adm. 285—and the authorities there cited. But this claim of this libellant cannot be viewed as of the highest order of merit, and as entitling him to a high rate of compensation. His conduct was certainly praiseworthy, and such as to give him a fair claim to remuneration beyond the ordinary pay of a master, but there was not the personal risk, exposure, hardship, and labor; nor is there the certainty that the property was saved through his interposition, that will justify a large allowance to him as a salvor. And it may not be improper here to remark, that in salvage claims arising on the western rivers, the precedents of courts administering the admiralty law on the ocean, in regard to the amount of compensation, cannot be safely adopted. In general, the peril of life, in cases of disaster on our rivers, afford-

ing a claim for salvage service, is not equal to those resulting from disasters on the ocean.

Upon the whole view of the case, the court adopt the suggestion of Mr. Justice Johnson, in the case before referred to, and award a compensation in numero, to the libellant, instead of any fixed per centage, or proportion of the value of the property. And this amount is fixed at five hundred dollars, to be assessed upon the boat and the cargo, according to their value at the port of Cincinnati. Upon the question of jurisdiction, the court has only to remark, that the opinion of the supreme court at its last session, in the case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, is regarded as decisive. The decision in that case is authoritative in all the courts of the Union. By it the doctrine is settled, "that the admiralty and maritime jurisdiction granted to the federal government by the constitution of the United States is not limited to tide-waters, but extends to all public navigable lakes and rivers, where commerce is carried on between different states, or with a foreign nation."